# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RAMONITA ARROYO; ARIANA ARROYO JOHNSON; JULIO M. ARROYO; CHILI IRIS RIVAS; CHIKI JUANITA RIVAS; SASHA CALIXTO; JAEN PEREZ; JIVANLEE PEREZ; JENSEN DAVILA; JOHANNY RHOBES; SASHA CALIXTO AND JAEN PEREZPPA JEWEL PEREZ;  SASHA CALIXTO PPA TREVON ROMELO EMERY; JUANITA LEBRON; RAMONITA ARROYO AND JUANITA LEBRON PPA EVELYN MARIA BONILLA | : : : : : : : : : : | CIVIL ACTION NO. |
| *Plaintiffs*, | : | |
| v. | : | JURY TRIAL DEMANDED |
| NORTHLAND INVESTMENT CORPORATION; LAWRENCE R. GOTTESDIENER; CHURCH STREET NEW HAVEN, LLC; NORTHLAND FUND II, LP; AND NORTHLAND FUND II PARTNERS, LLC, | : : : | |
| *Defendants*. | : | NOVEMBER 1,2018 |

## COMPLAINT

### Introduction

Plaintiffs bring this diversity-of-citizenship action to recover damages for injuries caused by the recklessness, negligence, breach of contract, and unfair trade practices of the defendants, Northland Investment Corporation, Church Street New Haven LLC, Lawrence R. Gottesdiener, Northland Fund II LP, and Northland Fund II Partners, LLC in connection with their ownership and management of the Church Street South housing complex in New Haven. All plaintiffs lived at Church Street South from 2001 until 2017, when they were displaced because of the unlivable condition of their apartments and the defendants' plan to empty and demolish the complex to make way for upscale redevelopment.

## I.       Jurisdiction and Venue

1.       This action is brought pursuant to the laws of the State of Connecticut.

2.       All Plaintiffs reside in and are citizens of the State of Connecticut. All Plaintiffs lived at Church Street South for approximately fifteen years beginning in 2001 except for the minor children, who lived at Church Street South from birth until they were displaced. Plaintiffs' names, dates of birth, and addresses at Church Street South are as follows:

(1)     Ramonita Arroyo (DOB 01/01/1971) lived at 13A Cinque Green.

(2)     Ariana Arroyo Johnson, (DOB 11/6/1998) lived at 13A Cinque Green.

(3)     Julio M. Arroyo (DOB 11/26/1946) lived at 8A Christopher Green and 13A Cinque Green

(4)     Chili Iris Rivas (DOB 07/02/1990) lived at 8A Christopher Green.

(5)     Chiki Juanita Rivas (DOB 07/24/1989) lived at 8A Christopher Green.

(6)     Sasha Calixto (DOB 11/28/1988) lived at 13A Cinque Green.

(7)     Jaen Perez (DOB 01/08/1991) lived at 6A Jose Marti Court.

(8)     Jivanlee Perez (DOB 06/20/1989) lived at 6A Jose Marti Court.

(9)     Jensen Davila (DOB 05/27/1992) lived at 6A Jose Marti Court.

(10)    Johanny Rhobes (DOB 08/24/1967) lived at 6A Jose Marti Court.

(11)    Jewel Perez (DOB 11/13/2016) lived at 13A Cinque Green.

(12)    Trevon Rometo Emery (DOB 05/11/2008) lived at 13A Cinque Green.

(13)    Juanita Lebron, (DOB 6/23/1946) lived at 8A Christopher Green and 13A Cinque Green.

(14)    Evelyn Maria Bonilla (DOB 05/31/2005) lived at 8A Christopher Green and 13A Cinque Green.

3.      Defendants are citizens of the State of Delaware and the State of Massachusetts. Upon information and belief, none of the defendants are citizens of the State of Connecticut. The defendants are as follows:

(1)     Northland Investment Corporation ("NIC") is a real estate development company that manages over $3 billion in real estate properties in New England, Texas, and the southern United States.  Northland is a Massachusetts stock corporation with its principal place of business located at 2150 Washington Street, Newton, Massachusetts.

(2)     Lawrence R. Gottesdiener is NIC's Chief Executive and Chairman and participated in the conduct described in this complaint, including decisions concerning the acquisition of Church Street South, maintenance at Church Street South, and the relocation of residents from Church Street South. Upon information and belief, Mr. Gottesdiener is a citizen of the State of Massachusetts.

(3)     Church Street New Haven LLC ("CSNH LLC") is a single-member, single-asset Delaware Limited Liability Company with its principal place of business located at 2150 Washington Street, Newton, Massachusetts. Defendant LLC's sole member is Northland Fund II LP.

(4)     Northland Fund II LP ("Partnership") is a Delaware limited partnership with its principal place of business located at 2150 Washington Street, Newton, Massachusetts. Defendant Partnership's General Partner is Northland Fund II Partners, LLC.

(5)     Northland Fund II Partners, LLC ("General Partner") is a Delaware Limited Liability Company with its principal place of business located at 2150 Washington Street, Newton, Massachusetts. Defendant General Partner's sole member is Northland.

4.      All Plaintiffs seek compensatory damages exceeding $75,000, exclusive of interests and costs, as well as punitive damages and attorneys' fees pursuant to Conn. Gen. Stat. §§42-110g, 42-150bb, and Connecticut common law.

5.      Venue is proper in this District in that plaintiffs reside in this district and a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this District.

6.      Plaintiffs are proposed class members on whose behalf relief is currently being sought in *Noble v. Northland*, Docket No. X10-UWY-CV-16-6033559-S (Conn. Sup. Ct.), returned to court on December 27, 2016, motion for class certification pending. The filing of the proposed class action in *Noble* tolled and continues to toll the statutes of limitations applicable to plaintiffs' claims. *Grimes v. Hous. Auth. of New Haven*, 242 Conn. 236 (1997).

## II.    Factual Allegations

*A. Defendants' Conduct*

7.      Church Street South (or "CSS") was an apartment complex of 301 apartment units on a 13-acre parcel located at the intersection of Church Street, Union Avenue, and South Orange Street in New Haven, across the street from Union Station and near Yale-New Haven Hospital and New Haven's downtown. It was intended to provide housing for approximately 1,000 low-income adults and children, and was one of few places in New Haven for low-income families to live because New Haven and its surroundings have a shortage of decent, safe, and sanitary housing for poor families.

8.      CSS was completed in 1970. It provided housing for approximately 1,000 low-income adults and children. It was emptied during 2015 to 2018 and is now being demolished by the Northland Defendants to make way for large, high-end development, with low-income

housing for at most a fraction of the number of residents who vacated Church Street South as part of the defendants' demolition and redevelopment plan, further described below.

9.      The defendants are private, for-profit real estate developers. NIC is a real estate development company that manages over $3 billion in real estate properties in New England, Texas, and the southern and western United States.  It is a Massachusetts corporation with its principal place of business in Newton, Mass. NIC holds itself out as a company that manages every aspect of development, "[f]rom contract negotiation to ribbon cutting and every step in between."

10.      Lawrence R. Gottesdiener is NIC's Chief Executive and Chairman, an officer of Defendant LLC at all relevant times, and he participated in the conduct described in this complaint, including decisions concerning the acquisition of Church Street South, maintenance at Church Street South, the relocation of residents from Church Street South, and the potential redevelopment of Church Street South. At all relevant times, Defendant Gottesdiener had possession and control of the property. As he has said, he willingly accepted ownership of Church Street South; he bought it intending to replace it; and he was responsible for organizational failure there. At all relevant times, Defendant Gottesdiener was personally involved in decisions regarding the day-to-day management of the complex, including decisions about repairs and capital expenditures, budgets, response to complaints, and moving families to area motels, among other subjects.

11.      CSNH LLC, a single-member, single-asset entity, is under the common ownership, management, and pervasive control of NIC and is NIC's agent. NIC, using CSNH LLC as an agent, alter ego, and instrumentality, acquired Church Street South in 2008 through its control of Partnership and General Partner. NIC created CSNH LLC for the sole purpose of

acquiring, operating, and leasing Church Street South. It did those things as NIC's alter ego. CSNH LLC holds the title to Church Street South, but at all times after acquisition, NIC and Gottesdiener were in control and had possession of the complex. At all relevant times, NIC and Gottesdiener directed the management of CSNH LLC's assets, revenues, liabilities, and expenses. Upon information and belief, NIC disregards corporate formalities and intermingles NIC and CSNH LLC's business activities. For example:

    A.    At all relevant times NIC and CSNH LLC acted as a single economic unit, as Defendant LLC had no employees; always acted as an agent for NIC; had no separate records relating to Church Street South from NIC records; contractors and property managers at Church Street South knew the owner of the property to be "Northland" or NIC; no differentiation was made between CSNH LLC and NIC in communications with contractors or property managers; and any individual authorized to act on behalf of CSNH LLC was in fact a NIC employee or agent.

    B.    NIC's control of the complex was made possible through its control and domination of CSNH LLC directly and through its operation of other affiliated entities. CSNH LLC has no separate identity or ability to act separate from NIC and the control that NIC exerts over it. The acquisition of Church Street South from its previous owners was a decision made by NIC and Gottesdiener. At all times after acquisition of Church Street South, NIC and Gottesdiener, at times acting through CSNH LLC or other agents, made decisions at the complex regarding its maintenance, management, security, finances, redevelopment, legal matters, and all other matters, including the displacement of the residents. NIC and Gottesdiener communicated directly with state and federal government agencies regarding matters affecting Church Street South and its residents without making reference to any separate ownership, control, or decision-

maker. NIC was the named insured entity for the property and CSNH LLC was an additional insured. NIC made expenditures at the property when, for example, it was ordered to do so by state and federal agencies.

12.     In 2008, the defendants acquired CSS for $4 million. Along with the property, the defendants acquired the right to collect rent from Church Street South's tenants that was supplemented by federal subsidies. Each year, in order to qualify for the funds, the defendants through their employees and agents certified to the federal government that they provided "decent, safe, and sanitary" housing at CSS in compliance with federal rules.

13.     Upon acquisition and at all relevant times the defendants were on notice that in order to be decent, safe, and sanitary, Church Street South badly needed top-to-bottom repairs to its structural elements such as the building envelope, roofing, windows, plumbing, heating, ventilation, and more.

14.     The defendants purchased the property not intending to manage it for the long term but instead to demolish and replace it with a more profitable development as soon as feasible. As a result, the defendants did not take the measures necessary to make the project a safe, sanitary, and durable home for its residents. Instead they made patchwork repairs that were cheaper but less effective while the property became increasingly hazardous to residents' health and safety, a decline that provided a rationale for razing it and building a far more profitable project in its place.

15.     The defendants hired two property managers at CSS: Non-Party DeMarco Management Corporation from acquisition in 2008 to July 2015, and Non-Party Wm. M. Hotchkiss Company from July 2015 until the complex was made vacant in 2018. The agreements were signed by officers of CSNH LLC and the property managers and expressly designated the

property managers as CSNH LLC's agent, but at all times the defendants maintained possession and control over the property.

16.     At all relevant times, and as provided in the contracts with the property management companies, the defendants kept possession and control over the property, including, among other things, its roofs, walls, floors and ceilings, structural supports, plumbing and hot water facilities, ventilation systems, and common areas. The defendants also exercised financial control over all aspects of CSS's operations, including rents, security deposits, the terms of all leases, the annual operating budget, and the budget for capital expenses. The defendants retained access to and control over all accounts at all times. Repairs or maintenance outside the defendants' budget were not allowed except under limited circumstances and with one or more of the defendants' express permission.

17.     Pervasive unlivable conditions were a continuing problem throughout the time the defendants controlled the property. Public health and safety crises from the inception of the defendants' ownership documented by government authorities include, among others:

A.     In 2009, more than 90% of units inspected by the City of New Haven's Livable Cities Initiative (LCI) failed inspection, and in a follow-up inspection every apartment inspected failed again. City officials observed then that issuing a fine was the only way to get NIC's attention and that the defendants were failing to make investments to bring units back online when they were vacated, despite a long waiting list for residency at CSS;

B.     In 2011, a carbon monoxide leak forced the temporary evacuation of an entire 14-unit building, and in an ensuing inspection by the City of New Haven more than 100 apartments were found to have life-threatening defective furnace exhausts. The defendants proposed "simply

installing CO detectors and carrying out random testing," a proposal the City of New Haven found unacceptable; and

C.    In 2013, a HUD inspection of 24 apartments found 12 systemic problems and 11 life-threatening health and safety violations, and a follow-up inspection discovered additional code violations in 59 other apartments. The violations caused a representative from HUD to tell the defendants that the agency would soon be sending a notice of default regarding CSS. Many of the hazards and violations observed, however, were still present at the property years later.

18.    By continuing to enter leases and collect rent for apartments that were not decent, safe, and sanitary, in violation of local and state building, health, and safety codes and federal regulations, the defendants violated the public policy of the City of New Haven, the State of Connecticut, and the United States, and breached their duties to the plaintiffs.

19.    The defendants also breached their duties to the plaintiffs by:

(1)    permitting the existence and growth of mold, fungi, bacteria, dust mites, and other airborne contaminants and other health hazards;

(2)    failing to eliminate or remediate the water incursion;

(3)    failing to inspect, or making inadequate inspections, to identify violations of law and hazards to health and safety, despite notice;

(4)    failing to inspect, or making inadequate inspections, of the areas of water incursion, despite notice of environmental and health hazards caused by water incursion;

(5)    failing to conduct necessary testing to determine the presence of mold, mildew, bacteria, fungi, dust mites or other hazardous substances within the apartments;

(6)    failing to take adequate measures to prevent water incursion and flooding through the roofs;

(7)     failing to take adequate measures to prevent water incursion and flooding from the plumbing;

(8)     failing to take adequate measures to prevent water incursion and flooding through the walls;

(9)     participating in the creation of a nuisance by allowing the growth of mold, fungi, bacteria, and dust mites and allowing other health hazards to exist;

(10)    failing to take steps to remediate the growth of fungi, mold, bacteria, and infestation of rodents, cockroaches, and dust mites, when they knew or should have known that the failure to do so would expose the plaintiffs to injuries;

(11)    failing to warn the plaintiffs of the environmental and health hazards present at the complex;

(12)    maintaining the apartments in the hazardous conditions described in this complaint;

(13)    breaching duties owed to the plaintiffs pursuant to Connecticut General Statutes § 47a-7, by failing to fulfill statutory obligations to:

    (1)     comply with the statutory obligations set forth in Connecticut General Statutes § 47a-7 to maintain the premises in a fit and habitable condition;

    (2)     make all repairs and do what is necessary to put and keep the premises in a fit and habitable condition;

    (3)     keep all common areas of the premises in a clean and safe condition;

    (4)     maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances that they were required to supply; and

(5)     remedy mold contamination, as required by Connecticut General Statutes § 47a-12(a); and

(14)   breaching duties owed to the plaintiffs by failing to comply with the requirements of the New Haven Housing Code to ensure: that every unit on the premises had a complete bathroom fixture group in sound working condition and in good repair  [¶ 300(b)]; that every unit on the premises had water heating facilities that were properly installed and maintained in safe and in good working condition  [¶ 300(e)]; that every habitable room on the premises had at least one working window or skylight that could be easily opened or another device to adequately ventilate each room [¶ 301(b)]; that every unit on the premises had a heating system that was properly installed, maintained in safe and good working condition, and capable of providing adequate heat to all rooms and bathrooms within the unit [¶ 301(e)];  that roofs on the premises were reasonably weather-tight, water-tight, rodent- and insect-proof, in sound working condition, and in good repair [¶ 302(a)];  that windows were reasonably weather-tight, water-tight, rodent proof, in sound working condition, and in good repair [¶ 302(b)]; that stairs and porches on the premises were in sound condition and good repair [¶ 302(c)];  that plumbing fixtures, water, and waste pipes were properly installed and maintained in good sanitary working condition, free from defects, leaks, and obstructions [¶ 302(d)];  that floors in kitchens and bathrooms on the premises were constructed and maintained so as to be reasonably impervious to water and to permit such floor to be easily kept in a clean and sanitary condition [¶ 302(e)]; that walls, ceilings, interior woodwork, doors, and windows were free of flaking, peeling, and loose paint, and to properly resurface or repaint such surfaces as needed [¶ 302(h)]; and by failing to implement effective prevention methods to thwart mold growth.

21.    Throughout the defendants' ownership continuing until the complex was completely emptied out and as a result of the defendants' conduct, each building at Church Street South had pervasive defective, dangerous, and toxic conditions, including but not limited to the following:

(1)    leaks, cracks, and holes in walls, floors, ceilings, and foundations, which caused serious microbial problems, including mold colonization and other hazardous conditions as further described in this complaint;

(2)    leaks in the water pipes;

(3)    leaks, cracks, and holes in the roofs;

(4)    contamination with toxigenic mold species, bacteria, dust mites, roaches, rodents, and fungi;

(5)    water incursion due to leaks in roofs, water pipes, walls, ceilings, windows, and floors of all the buildings, creating and exacerbating the growth of airborne bacteria, fungal mold spores, roach and rodent infestations, and dust mites;

(6)    inadequate outdoor air ventilation and a shortage of fresh air, which contributed to the growth of mold and other chemical and biological contaminants;

(7)    lack of adequate humidity control, which exacerbated the mold growth problems; and

(8)    recurrent flooding from bathroom and kitchen fixtures, through doors and windows, and through leaks in water pipes, ceilings, and walls, particularly during storms, causing further water damage to apartments, mold growth, and water damage to plaintiffs' belongings.

22.    The defendants recklessly disregarded their duty to address the sustained dampness caused by CSS's structural defects, injuring plaintiffs. Their conduct resulted, at best,

in maintenance staff cleaning or painting over mold on walls, ceilings, bathroom fixtures, kitchen fixtures, and floors, but the mold grew back because the dampness was unaddressed. Cosmetic repairs such as patching and painting mold infestations and concealing major structural issues were made before showing apartments to prospective tenants or inspectors, and city and federal inspectors were falsely told that serious health and safety issues would be remedied. Because of the defendants' failure to remedy persistent mold in the apartments, plaintiffs were forced to try to fix serious mold problems themselves. Plaintiffs, however, lacked control over the structural elements causing the water leaks and infiltration, which allowed the mold to grow back again and again.

23.    The demolition process consisted first of removing residents from apartments that had been formally condemned or that posed documented imminent threats to their health. Meanwhile, all residents were told that they had to leave, with no assurance that leases for apartments at Church Street South would be honored. Some were moved to hotels, where entire families were typically housed in one room, while the others were directed to find some other place to live. During this emptying-out period CSS became increasingly unlivable as vacant, boarded-up apartments attracted squatters, vandals, drug users, and gangs.

B.    *Plaintiffs' Injuries*

24.    As a result of defendants' conduct described above, plaintiffs experienced the harmful effects of fungi, mold, dust, dust mites, mildew, and bacteria exposure, and poor indoor air quality. The full extent of these injuries is not yet known, but they include the following medical conditions, among others, which can be permanent and can accelerate over time: allergic rhinitis; sinusitis; respiratory problems secondary to mold exposure; chronic swollen neck glands with tenderness; muscle spasms; headaches; sore throats; nasal congestion; nausea; loss of

appetite; dizziness; lethargy; fatigue; difficulty concentrating and cognitive impairment; hives; skin rashes and exacerbated eczema; hypersensitivity to allergens; lowered immunity; dysphoria; physical pain; difficulty swallowing and digesting food; nose bleeds; triggered or exacerbated preexisting sensitivities to mold, fungi, dust mites, and bacteria and other allergens; anxiety and emotional distress; and the side effects of medications made necessary by these conditions.

25.     Plaintiffs have suffered injuries that are painful and disabling and that have impaired their ability to engage in the activities of life and will continue to do so in the future.

26.     As a further result of defendants' conduct, plaintiffs have been displaced from their homes, on short notice, causing distress, disruption, inconvenience, and expense, as well as the hardship of living as a family in a single hotel room before replacement housing was found. These hardships include being cramped into smaller living spaces, with fewer bedrooms, forcing family members to share bedrooms and even beds, which has caused difficulty sleeping, stress, and discomfort; being forced to live in apartments without cooking facilities, interrupting families' ability to prepare meals and provide for their children's nutritional needs; losing access to facilities for cleaning laundry; losing the privacy that comes with living in one's own home as opposed to living in a hotel for an extended period of time; being relocated to living arrangements farther from work, school, and shopping, causing inconvenience and hardship; and other discomfort and hardship.

27.     As a further result of defendants' conduct, the plaintiffs have required medical treatment and in some cases hospitalization and have incurred expenses for necessary care and treatment; and plaintiffs will require further care and treatment and incur further expenses in the future.

28.    As a further result of defendants' conduct, the plaintiffs have been forced to discard items of personal property that had become contaminated and permanently damaged by the water, moisture incursion, rodent and/or insect infestation, and mold contamination within their apartments.

29.    As a further result of defendants' conduct, the minor plaintiffs have lost time from school and were unable to attend school as they did before and concentrate on school work.

30.    As a further result of defendants' conduct, the adult plaintiffs have lost time from work, and their earning capacity has been reduced.

31.    As a further result of defendants' conduct, the plaintiffs have suffered  increased risk of contracting serious latent diseases resulting from exposure to the hazardous conditions at their apartments, including asthma, other respiratory ailments, cancer, and reproductive disorders, so that ongoing medical monitoring is required.

32.    The injuries caused by the defendants' conduct also include the diminution of the rental value of and displacement from plaintiffs' apartments, which caused economic and non-economic harms and losses including emotional distress, annoyance, and discomfort.

33.    Specifically, plaintiffs and their circumstances are as follows:

(1)    Plaintiffs Ramonita Arroyo, Ariana Arroyo Johnson, Sasha Clixto, Jewel Perez, Trevol Romelo Emery, moved into 13A Cinque Green in approximately 2001. From the time these plaintiffs moved into the apartment and continuously thereafter the apartment was defective, dangerous, and hazardous to their health. Conditions included:

    a.    Leaks, cracks, and holes in walls, floors ceilings, and fountains, which have caused serious microbial problems, including mold colonization and other hazardous conditions as further described in this complaint;

b.  Leaks in the water pipes;

c.  Leaks, cracks and holes in the roofs;

d.  Contamination with toxigenic mold species, bacteria, dust mites, roaches, rodents, and fungi;

e.  Moisture incursion due to leaks in rooks, water pipes, walls, ceilings, and floors of all the buildings, creating and exacerbating the growth of airborne bacteria, fungal mold spores, roach and rodent infestation, and dust mites;

f.  Inadequate outdoor ventilation and shortage of fresh air, which contributed to the growth of mold and other chemical and biological contaminants;

g.  Lack of adequate humidity control, which has exacerbated the mold growth problems; and

h.  Recurrent flooding from bathroom and kitchen fixtures, through doors and windows, and through leaks in water pipes, ceilings, and walls, particularly during storms, causing further damage to apartments, mold growth, and water damage to residents' belongings.

The defendants and their agents and employees made repairs late, inadequately, or not at all. Because of the unlivable conditions at the apartment, in 2017 plaintiffs were told to leave their apartment by January 15, 2017. The family was moved to Village Inn and Suites in New Haven, Connecticut.

(2)  Plaintiffs Juanita Lebron, Julio Arroyo, Chili Iris Rivas, Chiki Juanita Ramos, and Evelyn Maria Bonilla moved into 8A Christopher Green in approximately 2001. Because of the deplorable conditions located at 8A Christopher Green, the plaintiffs thereafter were relocated to 13A Cinque Green. From the time these plaintiffs moved into the apartment

and continuously thereafter the apartment was defective, dangerous, and hazardous to their health. Conditions included:

a. Leaks, cracks, and holes in walls, floors ceilings, and fountains, which have caused serious microbial problems, including mold colonization and other hazardous conditions as further described in this complaint;

b. Leaks in the water pipes;

c. Leaks, cracks and holes in the roofs;

d. Contamination with toxigenic mold species, bacteria, dust mites, roaches, rodents, and fungi;

e. Moisture incursion due to leaks in rooks, water pipes, walls, ceilings, and floors of all the buildings, creating and exacerbating the growth of airborne bacteria, fungal mold spores, roach and rodent infestation, and dust mites;

f. Inadequate outdoor ventilation and shortage of fresh air, which contributed to the growth of mold and other chemical and biological contaminants;

g. Lack of adequate humidity control, which has exacerbated the mold growth problems; and

h. Recurrent flooding from bathroom and kitchen fixtures, through doors and windows, and through leaks in water pipes, ceilings, and walls, particularly during storms, causing further damage to apartments, mold growth, and water damage to residents' belongings.

The defendants and their agents and employees made repairs late, inadequately, or not at all. Because of the unlivable conditions at the apartment, in 2017 plaintiffs were told to

leave their apartment by March 15, 2017. The family was moved to Village Inn and Suites in New Haven, Connecticut.

(3)    Plaintiffs Jaen Perez, Jivanlee Perez, Jensen Davila, and Johanny Rhobes, moved into 6A Jose Marti Court in approximately 2001. From the time these plaintiffs moved into the apartment and continuously thereafter the apartment was defective, dangerous, and hazardous to their health. Conditions included:

    a.  Leaks, cracks, and holes in walls, floors ceilings, and fountains, which have caused serious microbial problems, including mold colonization and other hazardous conditions as further described in this complaint;

    b.  Leaks in the water pipes;

    c.  Leaks, cracks and holes in the roofs;

    d.  Contamination with toxigenic mold species, bacteria, dust mites, roaches, rodents, and fungi;

    e.  Moisture incursion due to leaks in rooks, water pipes, walls, ceilings, and floors of all the buildings, creating and exacerbating the growth of airborne bacteria, fungal mold spores, roach and rodent infestation, and dust mites;

    f.  Inadequate outdoor ventilation and shortage of fresh air, which contributed to the growth of mold and other chemical and biological contaminants;

    g.  Lack of adequate humidity control, which has exacerbated the mold growth problems; and

    h.  Recurrent flooding from bathroom and kitchen fixtures, through doors and windows, and through leaks in water pipes, ceilings, and walls, particularly during

storms, causing further damage to apartments, mold growth, and water damage to

residents' belongings.

 The defendants and their agents and employees made repairs late, inadequately, or not at all.

Because of the unlivable conditions at the apartment, in 2017 plaintiffs were told to leave their

apartment by October 1, 2016. The family was moved to 283 Forbes Street, New Haven,

Connecticut.


### First Claim for Relief:
### Unfair Trade Practices
### All Plaintiffs against All Defendants


34.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs with the same force and effect as if fully set forth here.

35.    At all relevant times, the defendants were engaged in trade or commerce within

the meaning of the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a et. seq. (CUTPA).

36.    The defendants' actions and inactions were unfair and deceptive acts and practices

in the conduct of trade or commerce in violation of CUTPA because these actions and inactions

were unfair, immoral, unethical, oppressive and unscrupulous, caused substantial injury to

consumers, and violated Connecticut public policy. The defendants allowed conditions to

deteriorate at Church Street South through a deliberate, unfair, unscrupulous, immoral, unethical,

and deceptive plan.

37.    Specifically, the defendants engaged in immoral, unethical, oppressive,

unscrupulous, and deceptive conduct:

(1)    Defendants' conduct was a plan of "demolition by neglect," allowing conditions to

deteriorate to a point where tenants would be forced to move out.  Defendants knew that each

tenant relocated from Church Street South would be another tenant unlikely to desire a place in a

future development of the property and that its neglect of Church Street South made the eventual condemnation of apartments inevitable, but they refused to address the hazardous conditions, instead spending as little money as they could repairing the structural elements of Church Street South;

(2)      In accordance with this plan, Defendants conducted insufficient repairs, hired unlicensed and incompetent contractors, patched over serious issues without resolving root causes, allowed toxic mold infestations to amplify, and refused to undertake structural repairs that could remedy tenants' complaints;

(3)      Defendants made false and misleading statements of material fact, and concealed and omitted material facts, regarding apartments of Church Street South, by:

(a)      sending teams of maintenance workers to patch and paint severe toxic mold infestations and conceal major structural issues when showing apartments to prospective tenants;

(b)      maintaining and repairing the apartments that they showed to inspectors, in order to avoid legal liability without addressing tenants' issues and concerns;

(c)      falsely representing to tenants that issues within their apartments would be fixed when they had no plans to undertake the repairs necessary to resolve these problems; and

(d)      falsely representing to city and federal inspectors that serious structural issues would be addressed;

(4)      Defendants exploited plaintiffs because they had knowledge that residents at Church Street South received rent subsidies that were not transferable to apartments outside of the complex. Because plaintiffs had no choice as a practical matter but to stay within their apartments, defendants were able to make repairs slowly or simply ignore their complaints;

(5)    Defendants violated the public policy of the State of Connecticut and City of New Haven by continuing to enter leases and collect rent for apartments that were unsafe, unsanitary, and indecent, and in violation of local and state building, health, and safety codes; and

(6)    Defendants continued to collect rent with the knowledge that the rent was being collected for apartments that were and are uninhabitable and unsafe in violation of the Connecticut General Statutes and New Haven Housing Code.

38.    As a result of the unfair and deceptive conduct of defendants, plaintiffs have suffered ascertainable losses within the meaning of Connecticut General Statutes § 42-110g and are entitled to compensatory damages and attorneys' fees for the injuries described in this complaint..

39.    Plaintiffs are also entitled to punitive damages because the defendants' conduct which violated CUTPA, as described in this complaint, reveals a reckless indifference to plaintiffs' rights as consumers of rental housing.

**Second Claim for Relief:**
**Breach of Warranty of Habitability**
**All Plaintiffs against All Defendants**

40.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

41.    At all relevant times, plaintiffs and defendants were parties to leases whereby they provided dwellings to plaintiffs in exchange for payment of rent.

42.    There is an implied warranty of habitability and fitness for intended use in all residential leases. The conditions at Church Street South, as described in this complaint, breached this implied warranty.

43.     Plaintiffs have been injured by defendants' breach of the implied warranty of habitability and have suffered injuries caused by the conditions at Church Street South and from being dislocated from their homes. Plaintiffs are entitled to compensatory damages for the injuries described in this complaint caused by defendants' breach of the implied warranty of habitability.

44.     Plaintiffs are also entitled to complete or partial abatement of rent as a result of Defendants' breach of the implied warranty. Additionally, all leases at CSS contained a "Legal Addendum" that obligated tenants to pay the landlord's legal fees and court costs should the landlord initiate legal action based upon the lease. The addendum triggers the applicability of Conn. Gen. Stat. § 42-150bb, which provides for payment of legal fees to the tenants who prevail in actions based on the lease, and entitles plaintiffs to attorneys' fees.


**Third Claim for Relief:**
**Breach of Lease**
**All Plaintiffs against All Defendants**


45.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

46.     At all relevant times, plaintiffs and defendants were parties to leases whereby they provided dwellings to plaintiffs in exchange for payment of rent.

47.     The leases required defendants to, among other things, (a) "make necessary repairs with reasonable promptness," (b) "provide extermination services, as necessary," (c) "maintain all equipment and appliances in safe and working order," and (d) lease the unit to the tenant for the entirety of the lease term.

48.     Defendants' conduct, which resulted in the conditions described in this complaint and in each plaintiff being relocated before the end of the lease term, breached the leases.

49.     Plaintiffs have been injured by defendants' breach of the leases, and have suffered injuries caused by the conditions at Church Street South and from being dislocated from their homes. Plaintiffs are entitled to compensatory damages for injuries caused by defendants' breach of lease.

50.     Plaintiffs are also entitled to partial abatement of past and future rent as a result of defendants' breach of the leases. All leases at CSS contained a "Legal Addendum" that obligated tenants to pay the landlord's legal fees and court costs should the landlord initiate legal action based upon the lease. The addendum triggers the applicability of Conn. Gen. Stat. § 42-150bb, which provides for payment of legal fees to tenants who prevail in actions based on the lease, and entitles            plaintiffs            to            attorneys'            fees.

**Fourth Claim for Relief:**
**Negligence**
**All Plaintiffs against All Defendants**

51.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

52.     Because at all relevant times the defendants had control and possession of Church Street South, they had a non-delegable duty to keep it reasonably safe.

53.     At all relevant times, the conditions in all of plaintiffs' residences were unreasonably dangerous, defective, and hazardous to human health and safety.

54.     Defendants were on notice and well aware of the physical condition of the complex, which was obvious to them and made even more obvious by complaints from residents, warnings from the property management companies, findings in government inspections and reports and in reports the Defendants commissioned, the age of the complex, the heightened need

for maintenance and repairs due to the deteriorated common construction and design of the complex, and the necessity and timing of emergency repairs that were repeatedly required over the years of its ownership.

55.     The defendants' conduct failed to make and keep the premises reasonably safe for its residents, including plaintiffs, and was a breach of the standard of care owed by landlords to tenants.

56.     Plaintiffs are entitled to compensatory damages for the injuries described in this complaint caused by the defendants' negligence.

**Fifth Claim for Relief:**
**Recklessness**
**All Plaintiffs against All Defendants**

57.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

58.     The injuries to plaintiffs were caused by the defendants' recklessness in that the defendants were aware of – and it would be evident to any reasonable person in the defendants' position – the conditions described in this complaint, their legal obligation to correct the conditions, the dangers to health, safety and personal property that the continuation of these conditions created, and the distress caused by being displaced from one's home, and yet the Defendants chose not to correct the conditions.  Their choice was motivated in whole or in part by their desire to empty and demolish the project in order to replace it with a more profitable use. Plaintiffs are entitled to punitive damages because the defendants' conduct was the product of wanton misconduct and reckless indifference to the plaintiffs', and other residents', rights and well-being.

**Sixth Claim for Relief:**
**Negligent Infliction of Emotional Distress**
**All Plaintiffs against All Defendants**

59.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

60.     Defendants knew or should have known that their conduct involved an unreasonable risk of causing emotional distress and that such distress, if it were caused, might result in illness or bodily injury.

62.     Defendants' negligent and reckless conduct caused plaintiffs emotional distress.

63.     The distress plaintiffs suffered was of such a nature that it has in some cases resulted and may in the future result in illness or bodily harm.

64.     The distress suffered by plaintiffs was foreseeable and reasonable in light of the defendants' conduct.

65.     Plaintiffs are entitled to compensatory damages as a result of the defendants' negligent conduct that resulted in emotional distress.

**III.     Prayer for Relief**

WHEREFORE, Plaintiffs respectfully pray the following relief:

A.     Compensatory damages;

B.     Punitive damages;

C.     Attorneys' fees and other costs of the action; and

D.     Such other and further relief as this Court deems just and proper.

THE PLAINTIFFS,

RAMONITA    ARROYO;    ARIANA
ARROYO JOHNSON; JULIO M. ARROYO;

CHILI IRIS RIVAS; CHIKI JUANITA RIVAS; SASHA CALIXTO; JAEN PEREZ; JIVANLEE PEREZ; JENSEN DAVILA; JOHANNY RHOBES; SASHA CALIXTO AND JAEN PEREZ ppa JEWEL PEREZ;  SASHA CALIXTO ppa TREVON ROMELO EMERY; JUANITA LEBRON; RAMONITA ARROYO and JUANITA LEBRON ppa EVELYN MARIA BONILLA

BY:   /s/ Ronald S. Johnson

Ronald S. Johnson, Esq.
Juris No.: ct08577
Law Office of Ronald S. Johnson & Assoc.
100 Wells Street, Suite 2C
Hartford, Connecticut 06103
Phone: 860-231-9757
Facsimile: 860-233-8276
Email: janvier7@aol.com

## CLAIM FOR JURY TRIAL

Plaintiffs, through counsel, claim this matter for trial by jury.

THE PLAINTIFFS,

RAMONITA ARROYO; ARIANA ARROYO JOHNSON; JULIO M. ARROYO; CHILI IRIS RIVAS; CHIKI JUANITA RIVAS; SASHA CALIXTO; JAEN PEREZ; JIVANLEE PEREZ; JENSEN DAVILA; JOHANNY RHOBES; SASHA CALIXTO AND JAEN PEREZ ppa JEWEL PEREZ;  SASHA CALIXTO ppa TREVON ROMELO EMERY; JUANITA LEBRON; RAMONITA ARROYO and JUANITA LEBRON ppa EVELYN MARIA BONILLA

BY:   /s/ Ronald S. Johnson

Ronald S. Johnson, Esq.
Juris No.: ct08577
Law Office of Ronald S. Johnson & Assoc.
100 Wells Street, Suite 2C
Hartford, Connecticut 06103
Phone: 860-231-9757
Facsimile: 860-233-8276
Email: janvier7@aol.com